# EXHIBIT A



# Offer Letter of Employment

April 11, 2022

Caleb LeGrand
40 Collinsbrooke Ct
Simpsonville, SC 29681

Dear Caleb,

On behalf of Apex Home Loans, a division of Celebrity Home Loans, LLC, ("Company") I am pleased to offer you employment for the Branch Manager position, working from your current office reporting to Eric Gates. Your start date is anticipated to be 6/30/2022.  Under the terms of the APEX acquisition and integration, your seniority date for benefit purposes will be your seniority date with APEX, 1/1/2019. Your decision to join the Company as part of our team will allow you to play a vital role in our continued growth and success.

The terms of this Offer are as follows:

As a salary employee of the Company you will earn commissions in accordance with your Branch Manager Exhibit-A, payable in accordance with the Company's standard payroll practices and subject to applicable deductions and withholdings. You will be required to perform your duties to the Company responsibly and to adhere to the Company's performance expectations as communicated to you by management and outlined in the Company's policies and procedures.

As a regular, full-time employee, you are expected to work an average of forty (40)-hours per week. You will be entitled to receive benefits as provided in the Company's health and welfare plans, as well as the Company's 401(k) plan in accordance with the eligibility and enrollment terms set forth in the plan documents. You are eligible to participate in Celebrity's CelebFlex Time-Off, which is an unaccrued, discretionary policy, with no maximum to the amount of time that can be taken off, all time off is subject to request and manager approval.  Celebrity believes that taking time off to relax and recharge is critical to your success and ours, bringing reinvigorated perspective and energy to everything we do. We trust you to take the time you need, when you need it, to bring your best every day.

The details of the Company policies and practices are outlined in the Company's Employee Handbook and intranet site and are also available to you upon your request.

This offer of employment and your continued employment with the Company are contingent upon you:

1. Completing the Company's screening process, including satisfactory verification of employment, credit, and criminal background checks (each performed in accordance with



# <u>Offer Letter of Employment</u>

applicable laws). Details of the screening process will be provided to you under separate cover.

The Company is an at-will employer. This means both you and the Company may terminate the employment relationship at any time for any reason or no reason and with or without notice to the extent permitted by law. This letter is not to be construed as a guarantee of employment for any length of time. The terms and conditions of your employment may only be changed by a written agreement signed by an authorized representative of the Company.

You acknowledge and understand that your employment by the Company is conditioned upon your review of, and agreement with, additional Company policies defining the scope of your employment and obligations to the Company (the "Company Policies"). The Company Policies include the Employee Handbook, applicable state supplement, and the Code of Business and Ethics Conduct, among others, each of which may be amended from time to time.

An employment agreement is presented to you for your review and signature together with this letter (your "Employment Agreement.") You understand and agree that your Employment Agreement may be modified or amended in writing from time to time following its execution. This letter, together with your Employment Agreement and the Company Policies, constitutes the complete understanding between you and the Company concerning the terms of your employment. You agree and acknowledge that in accepting this offer, your Employment Agreement, and the Company Policies, you have not relied, to your detriment or otherwise, on any statements, promises, or assurances except those expressly set forth therein. Also, any prior agreements between you and the Company's representatives, whether oral or written, have been fully and completely incorporated in these documents and are fully superseded by this offer letter, your Employment Agreement, and the Company Policies.  To the extent there is any inconsistency or conflict between the provisions in this letter and your Employment Agreement, the terms and provisions in your Employment Agreement shall govern and control. The provisions of this letter are severable and, if any part of the letter is not legally enforceable that part shall be modified, and the rest shall remain in full force and effect.  If any such part is incapable of being modified, it shall be severed, and the rest enforced.

Except as may be prohibited by applicable law, you agree to keep the terms of this offer confidential and that you will not disclose the terms of the offer to any third party, without the prior written consent of the Company, other than to your spouse, partner, accountant or tax preparer, or attorney. Any unpermitted disclosure may immediately result in the revocation of the offer.

To ensure a successful employment process, please sign and return this offer letter, together with the attachments and exhibits, retaining a copy for your files.

DocuSign Envelope ID: B74EB594-25E9-4317-A346-D1EA3927E905



## <u>Offer Letter of Employment</u>

Again, welcome. We look forward to having you join our team.

Warmest Regards,

Sherri Harrington
VP, Human Resources

I accept the terms and conditions of this offer letter:

| | |
|---|---|
| Caleb LeGrand | 8/16/2022 |
| Caleb LeGrand | Date |

**BRANCH MANAGER EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT ("Agreement"), made and entered on the 25th day of May, is made by and between Celebrity Home Loans, LLC, its predecessors, successors, assigns and subsidiaries (collectively "the Company"), and Caleb LeGrand ("Employee") (individually "Party" and collectively the "Parties"). Employee desires to operate a Branch for Celebrity Home Loans, LLC and shall operate under the applicable states regulating mortgage lending activity as well as under all applicable federal laws. This agreement contains all the covenants and agreements between the Parties in any manner whatsoever. The Parties agree to the following:

## ARTICLE I - TERMS OF EMPLOYMENT

(1.1)   **At Will Employment**: The Company hereby employs Employee, and Employee hereby accepts employment with the Company. Employee's employment with the Company is on an at-will basis and this Agreement does not contain any guarantee of employment for a specific period. Either the Company or Employee may terminate this Agreement at any time, for any or no reason, with or without cause. Upon termination of employment, Employee may not perform any services on behalf of the Company concerning a borrower unless specifically pre-authorized in writing by an officer of the Company.

(1.2)   **Termination of Employment**: Either Party may terminate this Agreement at any time, with or without notice and with or without cause. Notwithstanding the foregoing, the terminating Party agrees to act in good faith to provide the other Party with advance notice of its intent to terminate employment.

(1.3)   **Performance After Termination**: In the event of termination, other than by breach, the Parties agree to cooperate in good faith to ensure the Company has the information and documentation in Employee's possession, custody or control to enable the Company to continue to support its borrowers and close and fund any applications and loans applied for during the performance of this Agreement, and to wind down the Branch, to the extent needed, with such cooperation period not to exceed sixty (60) days.

NMLS ID# 259691



Initials

## ARTICLE II - DUTIES OF Employee

**(2.1)** **Duties:** Employee's primary duty shall be the day-to-day operations of his/her branch ("Branch"), including the employees assigned to the Branch, management of the Branch's expenses, profits and losses (P&L), and the Branch's compliance with the Company's policies. Employee's duties include, but are not limited to:

i) remaining familiar with and ensuring that all loans originated by the Branch are handled in accordance with the Company's policies, guidelines, quality control, applicable federal, state, and local laws, and investor guidelines;

ii) ensuring that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at the Company's discretion;

iii) informing the Company immediately of any and all events, incidents, occurrences, complaints, lawsuits, investigations, findings, or good faith concerns of illegal, improper, or unethical or other material information or matters concerning the Company and/or Branch;

iv) managing the Branch's expenses to ensure they are consistent with the pro forma on file with the Company, and the Company's Operating Reserve and Loan Loss Reserve Policies and Requirements;

v) informing the Company of all expenses on a timely basis in order to ensure prompt payment thereof;

vi) hiring, developing, maintaining, training and supervising a sales force of loan originators and support staff to maximize Branch profit and minimize risk;

vii) ensuring that all persons performing any services for the Company through the Branch are Company employees, properly licensed and registered, as applicable, and are approved to start by the Company and, as applicable approved by the Company to originate loans.

viii) ensuring that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with the Do Not Call list and is in compliance with Federal and State rules.

ix) ensuring that all websites or other social media used by the Branch or any Branch employee that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public.

NMLS ID# 259691

Initials 

# Producing Branch Manager Employment Agreement

    xi)   ensuring that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are only advised to close loans if there is a good faith basis to believe that the borrower will be able to re-pay the loan.

**(2.2)** **Time**: Employee agrees to devote substantially all his/her business time, energy and attention in the performance of his/her duties to the Company during the term of this Agreement.

**(2.3)** **Exclusive Employment**: Employee shall not directly or indirectly render any related services of a commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of the Company. Employee shall not originate, place, or negotiate any loans, whether directly or indirectly, with any other financial firms during the term of this Agreement.

**(2.4)** **P&L Management**: Employee is responsible for operating the Branch in a profitable manner for the Company. Branches which are not profitable on at least a monthly basis are subject to being shut down or consolidated with other Branches at the Company's sole discretion.

**(2.5)** **Approval of Commercial Message in Any Medium:** Employee agrees that the Company must approve in writing prior to use of any forms, documents, materials, scripts, advertising copy, advertising no matter the format including, but not limited to written, video, social media, or verbal. The Company agrees that its approval may not be unreasonably withheld, conditioned, or delayed.

**(2.6)** **Fee Collection:** The Company has a No Trust Fund policy for up front collection of fees and therefore all fees collected in advance of settlement must be made out to a third party or paid for with Division operating funds.

**(2.7)** **Rules and Regulations Compliance:** Employee shall comply, and ensure that all Branch personnel comply, with all ordinances, laws, rules and regulations of any city, county, state and federal government having jurisdiction, investor guidelines and other requirements relating to mortgage origination including without limitation all applicable requirements of the Department of Housing and Urban Development ("HUD"), Veteran's Administration, Ginnie Mae, Fannie Mae and Freddie Mac (collectively, "Laws"). Employee represents to the Company that Employee is fully familiar with such Laws and Employee understands that the Company is



# Producing Branch Manager Employment Agreement

relying on such representation of Employee in agreeing to employ Employee.

**(2.8)** **Loan Commitments:** Loan commitments and rate lock-in agreements may only be issued by CHL's underwriting and secondary marketing department respectively

**(2.9)** **AML:** The Company has implemented an Anti-Money Laundering Policy (the "Policy") in accordance with the Bank Secrecy Act and other related policies and underlying laws and regulations. The Policy requirements include, but are not limited to, reasonable efforts be made to determine a customer's identity; the performance of adequate due diligence; the maintenance of high ethical standards to avoid suspect transactions; and if necessary the cooperation with law enforcement agencies, subject to customer confidentiality constraints. The Company requires that its own organization, its employees (including Employee) and its third-party vendors comply with all requirements of the Policy, the Bank Secrecy Act, Anti-money Laundering regulations and Suspicious Activity Reporting requirements as they exist and apply specifically to Non-bank Residential Mortgage Lenders or Originators (RMLO), or from time to time may be amended. Employee represents to the Company that Employee is fully familiar with the Policy, the Company's required annual training for all employees, and the underlying laws and regulations, and understands that the Company is relying on such representation of Employee in agreeing to employ Employee. Employee further understands and acknowledges that any Employee who fails to comply with the Company's AML policy shall be cut off from the Company network and prohibited from accessing loan files until the Employee complies.

**(2.10)** **RESPA Charges:** Employee shall not allow a borrower to be charged any fees more than that permitted by the Real Estate Settlement Procedures Act ("RESPA") or in violation of any other laws.

**(2.11)** **Employee Loans:** If the Employee or any other employee of Employee's Branch has or will have any interest in real property that will be the security for a loan made by the Company, the Employee shall make immediate written disclosure of the fact of such purchase, sale or loan to the Company prior to any activity in connection with such transaction.

**(2.12)** **Facility Maintenance:** The Employee shall be responsible for the maintenance, cleanliness and general appearance of all office locations within the Branch, as a place of business and an office



# Producing Branch Manager Employment Agreement

of the Company, meeting all federal, state, and local requirements.

**(2.13)** **Authority to Employ:** Employee shall have the authority to employ, on behalf of the Company, staff for the efficient operation of the office, and shall also have the authority to terminate said personnel provided Employee has received the requisite approvals from the Company. Employee shall have no other employment agreements with any Company employee outside the knowledge and consent of the Company. Said employees will be paid in accordance with schedules determined by Employee and approved by the Company.

**(2.14)** **No Authority to Bind:** It is specifically understood and agreed that Employee will have no express, apparent, or implied authority to bind the Company to any contract, instrument, form or agreement without the prior written approval of the Company. This includes, but is not limited to, any leases and contracts with vendors, consultants, independent contractors, professional service providers (such as lawyers or accountants), or software providers. As part of the Company approval process, all such proposed commitments are required to be provided to the Division President and the Company's vendor management and facilities departments. In most instances, contracts are required to be entered by the Company's authorized signatory, and not Employee. The prohibitions in this Section shall not apply to mortgage related documents, including FNMA form 1003, HUD form 92900-A and VA form 26-1802a (HUD/VA Addendum to Uniform Residential Loan Application) originated from the Branch. Employee agrees to indemnify and hold the Company harmless from any and all claims, which may arise from Employee's breach by unauthorized use of authority, under breach of contract claims.

**(2.15)** **Conduct:** Employee shall not engage in any conduct which would reflect negatively on the Company or adversely affect the Company's business or reputation or threaten or endanger the Company's ability to lawfully operate.

**(2.16)** **First Right of Refusal:** Employee will ensure that the Company has the first right of refusal to underwrite and fund all loans made from the Branch. It is only with the Company's prior consent that a loan originated from the Branch may be brokered out to another lender.

## ARTICLE III – COMPENSATION

**(3.0)** **Compensation:** The Company agrees to pay, and Employee agrees to accept the compensation



# Producing Branch Manager Employment Agreement

as set forth in **Addendum A**, which only may be modified in writing and authorized by the Company's President.

**(3.1)** **W-2 Reporting:** Employee and all employees of the Branch are to be paid W-2 wages.

## Article IV - BRANCH ACCOUNT AND RESERVES

**(4.1)** **Pro Forma**: Employee will submit a Pro Forma approved by the Company, that details the fixed operating expenses of the Branch. Fixed operating expenses include (i) all compensation and benefits of Branch employees, including Employee; (ii) taxes, licensing, recruiting, training, and hiring costs; (iii) insurance and government fund contributions; (iv) equipment; (v) supplies; (vi) the cost of any building or rent leases, modifications, or repairs; (vii) all costs associated with obtaining or renewing state licenses. This Pro Forma will form the basis for the monthly Profit & Loss statement prepared by the Company. The Parties agree that the fixed operating expenses in any Branch monthly Profit & Loss statement will not exceed by more than 3% (either in the total expenses or any single line item) the expenses reflected in the Pro Forma without advance notice and approval by the Company.

**(4.2)** **Branch Revenue:** The operating expenses of the Branch will be paid through the Branch's Monthly Assigned Revenue defined in **Addendum A**.

**(4.3)** **Branch Operating Reserves Account**: The Company will maintain an operating reserve account for the Branch in the amount of $500,000 which shall be considered the Initial Reserve Requirement. The Company, in its sole discretion, may increase or decrease the amount required to be held in the Reserve Account. The funds in the operating reserve will be used, among other things, to offset any negative balance of the Net Assigned Revenue from prior months, and extraordinary expenses incurred by the branch office, such as cost of litigation, litigation reserves upon advice of counsel, early payment default/pay-off and repurchase obligations and/or any costs or expenses associated with Branch Operations that remain unpaid or outstanding as of Branch Manager's termination and/or that arise following Branch Managers' termination. Should the Reserve Account balance drop below $500,000 at any time due to any of the reasons outlined above or any other reason, all Monthly Net Assigned Revenue and/or any monthly volume bonus will be allocated to the Reserve Account until it is fully



DocuSign Envelope ID: B74FB594-25E9-4217-9346-B1EA3927E905

# Producing Branch Manager Employment Agreement

funded and/or any deficiency or increase in the Reserve Account is satisfied.

## ARTICLE V – PROPRIETARY PROPERTY AND PERSONNEL

(5.1)   **Confidential Information:** Employee acknowledges that by reason of his/her employment hereunder, Employee will occupy a position of trust and confidence with the Company and that Employee will have access to confidential and proprietary information and trade secrets of the Company, all of which are the unique and valuable property of the Company. Employee acknowledges that, among other things, its business methods, leads, loan programs, advertising programs, referral sources, marketing strategies, software, investor lists, and employer's documentation (the "Confidential Information") have been developed through the expenditure of substantial time, effort and money which the Company wishes to maintain in confidence and withhold from disclosure to other persons. Accordingly, as a material inducement to the Company to enter into this Agreement, Employee acknowledges that s/he will become intimately involved and/or knowledgeable in regard to the Company's business and will be entrusted with the Company's confidential information, and both during his/her employment and after any termination thereof, Employee will use such information solely for the Company's benefit, and maintain as secret and will not disclose any of the Confidential Information to any third party (except as Employee's duties may require) without the Company's prior express written authorization.

(5.2)   **Company Property:** Employee acknowledges that all tangible property, documents, files, electronic records or data, or records or materials of any sort pertaining to the Company's business, whether prepared by Employee or otherwise coming into Employee's possession or control, are the sole and exclusive property of the Company and that Employee has no right to keep or use such documents or things following termination of his/her employment. This includes any property or equipment issued to the Employee at the start or during the course of his/her employment for Employee to perform his/her work. Employee agrees that, upon any termination of employment, Employee shall not retain any such documents or things in his/her possession and will immediately return them to the Company. Employee

DocuSign Envelope ID: B74FB594-25E9-4317-A346-B1EA3927E905

# Producing Branch Manager Employment Agreement

agrees that any equipment not returned within thirty (30) days of Employee's separation from the Company is the personal financial responsibility of the Employee.

**(5.3)** **Non-Solicitation of Customers:** Employee agrees that during his/her employment with the Company s/he will not directly or indirectly, on behalf of himself/herself or any other individual, organization, or entity solicit any customer or client or prospective customer or client of the Company to engage in or transact business with himself/herself or any other person or entity for services provided by the Company. Employee further acknowledges that all leads provided to or worked on by Employee and loans in process are the Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from the Company.

**(5.4)** **Non-Solicitation of Employees:** During the period Employee is employed by Company and, in the event of termination, for one year following termination for any reason, beginning on the last day of the Employee's employment with Company, the Employee agrees and covenants not to disrupt or interfere with the business of Company by directly or indirectly soliciting, recruiting, attempting to recruit, or raiding the employees of Company or otherwise inducing the termination of employment of any employee of Company or anyone who has been employed by Company within twelve months of the date of Employee's separation. Employee also agrees and covenants not to use Company's Confidential Information to directly or indirectly solicit the employees of Company. Employee's obligation not to solicit Company employees does not apply to any individuals Employee recruits to join the Company to work together at the same Branch.

**(5.5)** **Non-Use or Disclosure of Confidential Information.** The Employee understands and acknowledges that because of Employee's experience and relationship of trust with Company, the Employee will have access to and learn about much or all Company's Confidential Information, including Customer Information. Customer Information includes, but is not limited to, names, phone numbers, addresses, e-mail addresses, order history, order preferences, chain of command, pricing information and other information



# Producing Branch Manager Employment Agreement

identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee agrees and covenants that Employee will not use Company's Confidential Materials or Customer Information to directly or indirectly solicit the Company's customers, or to interrupt, disturb or interfere with the relationships of Company with its customers.

(5.6) **Privacy Policy:** Nothing in this Article is intended, or shall be construed, to prohibit the Employee from maintaining a separate database of Employee's own clients and referral sources, and to maintain ownership and control of that database upon separation of his/her employment from the COMPANY, subject to, and to the extent permitted by, the Gramm-Leach-Bliley Act ("GLBA") and/or other applicable state and federal consumer privacy laws. This means that any Non-Public Personal Information ("NPI"), as defined by the GLBA or applicable privacy laws, acquired, developed or utilized in connection with a loan file at the COMPANY may not be retained by Employee following his/her separation from the COMPANY. Employee is required to follow Company policies on this subject matter (which may be altered from time to time) to ensure compliance with all applicable privacy laws.

(5.7) **Subsequent Employer:** Employee agrees to show this Agreement to any subsequent employer with whom s/he works within twelve (12) months following the termination of employment with the Company.

(5.8) **Reasonable and Necessary/ Attorneys' Fees:** Employee agrees that the restrictions herein will not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment. Employee acknowledges that the protections afforded to Company herein, are reasonable and necessary. Employee agrees that should he/she breach any of these obligations relating to Confidential Information, the Company shall be entitled to the cost of all legal fees and expenses incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit.

(5.9) **Records-Ownership**: Employee expressly agrees and acknowledges that upon termination of this Agreement, all loan files, whether pending or closed, shall remain with, or promptly be returned to, the Company. All such files are and shall remain the sole and exclusive



# Producing Branch Manager Employment Agreement

property of COMPANY.

**(5.10)** **Existing EMPLOYEE Property**: Employee represents, and EMPLOYER recognizes that EMPLOYEE and/or an entity owned by EMPLOYEE lawfully owns, controls, and is in possession of (i) significant proprietary information which EMPLOYEE intends to bring to CHL for the benefit of both EMPLOYEE and CHL including, without limitation, training materials, tutorials, IP, trademarks, systems, and marketing related materials (collectively, "EMPLOYEE'S Confidential Materials"); and (ii) personal property, including, but not limited to, furniture, fixtures, and equipment (collectively "Employee Personal Property") acquired as part of a lease or thereafter. At the time of EMPLOYEE's separation from CHL for any reason, EMPLOYER will not challenge EMPLOYEE's or his/her entity's right to retain any and all EMPLOYEE Confidential Materials or Employee Personal Property which EMPLOYEE owned and controlled at the time of signing this Agreement, or which EMPLOYEE or CHL on behalf of EMPLOYEE purchased or developed during the term of this Agreement.  If, upon termination of EMPLOYEE's employment with CHL, EMPLOYEE wishes to retain any property purchased by CHL but not fully paid for through the profits of the Division (the "Property Balance"), EMPLOYEE may retain such property by paying the Property Balance to CHL.

## ARTICLE V - NO EXISTING RESTRICTIVE COVENANTS

Employee verifies that no "non-compete," non-solicitation or confidentiality agreements with any other company, person or entity are binding upon him/her as of the date this Agreement or, with the exception of a "non-compete" agreement (which requires notification to the Company), if Employee is under any form of restrictive covenant related to prior employment, Employee agrees not to violate said restrictive covenants through or during the course of Employee's employment with the Company.  Employee agrees s/he is not utilizing the confidential information obtained from a prior employer in performing any services on the Company's behalf. Employee also understands and agrees that his/her role and compensation with the Company may be modified (including terminated) as a result of any pre-existing and continuing non-compete agreement, and such reason is grounds alone for modification of the compensation detailed in Addendum A.  Employee agrees to never use confidential information obtained from a prior employer in performing any services on the Company's behalf.

# Producing Branch Manager Employment Agreement

## ARTICLE VI - INDEMNIFICATION BY EMPLOYEE

In the event that the Company (and/or any of Company's principals) is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigation, by a third-party (with third-parties including any other Company employee) based upon conduct that is outside the scope of Employee's employment or as a result of Employee's gross negligence, recklessness or intentional conduct (a "Proceeding"), Employee shall indemnify and hold harmless Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees). In Company's sole discretion, it may defend itself and Employee shall reimburse Company for all costs and expenses incurred by the Company in defense of such Proceeding (including attorneys' fees), as well as the cost of any prudent settlement, judgments, fines, or damages incurred by Company as a result of the Proceeding. The terms of this Article VII shall survive this Agreement and Employee's employment with Company or any affiliate of Company.

## ARTICLE VII - FORUM SELECTION/JURISDICTION

In the event that any litigation needs to be brought between the Parties to obtain temporary injunctive relief and/or enforce any or all provisions of this Agreement, the Parties agree that such an action may only be brought as an arbitration pursuant to the Arbitration Agreement executed or to be executed by the Parties.  The prevailing party in any such arbitration shall be entitled to its reasonable attorney's fees.

## ARTICLE VIII – MISCELLANEOUS

A. You acknowledge and understand that your employment by the Company is conditioned upon your review of, and compliance agreement with, the Company's policies defining the scope of your employment and obligations to the Company (the "Company Policies").  The Company Policies include the Employee Handbook, applicable state supplement, and Code of Business Conduct and Ethics, among others, each of which may be amended from time to time.



# Producing Branch Manager Employment Agreement

B. Your offer letter, together with this Employment Agreement, the Arbitration Agreement and the Company Policies, constitutes the complete understanding between you and the Company concerning the terms of your employment. You agree and acknowledge that in accepting your offer letter, this Employment Agreement, and the Company Policies, you have not relied, to your detriment or otherwise, on any statements, promises, or assurances except those expressly set forth therein. Also, any prior agreements between you and the Company's representatives, whether oral or written, have been fully and completely incorporated in these documents and are fully superseded by the offer letter, your Employment Agreement and the Company Policies. To the extent there is any inconsistency or conflict between the provisions in the offer letter and your Employment Agreement, the terms and provisions in this Employment Agreement shall govern and control.

C. The provisions of this Agreement are severable and, if any part of the agreement is not legally enforceable that part shall be modified and the rest then the other provisions shall remain in full force and effect. If any such part is incapable of being modified, it shall be severed and the rest enforced.

D. This Agreement may not be modified except in writing between all parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon except and unless incorporated herein or incorporated by written modification as permitted herein. Notwithstanding the foregoing, the parties agree that receipt of an email by Employee sent by the Company's President entitled Employment Contract Modification, that requires any receiving employee to acknowledge receipt thereof, shall be treated as a "writing" sufficient to modify the terms of this contract.

E. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach. The language of this Agreement shall be construed as a whole according to its fair meaning and not strictly for or against any party hereto.

DocuSign Envelope ID: B74FB694-25E9-4217-A346-B1EA3927E905

# Producing Branch Manager Employment Agreement

F.   The Parties agree that this Agreement shall be severable, meaning that if any provision is
held to be unenforceable, it shall not affect the validity or enforceability of the remainder
of the terms and provisions of this Agreement.

*(Signature page to follow)*

# Producing Branch Manager Employment Agreement

IN WITNESS WHEREOF and intending to be legally bound hereby, the parties have read, understood and executed this Agreement the day and year above written.

Celebrity Home Loans, LLC

DocuSigned by:

*Caleb LeGrand*

06C1E6FB8FD2403...

By:

DocuSigned by:

15649CAD824C422...

_____         _____
Producing Branch Manager – Caleb LeGrand          Michael Stoddart, President



# Producing Branch Manager Employment Agreement

### ADDENDUM A

Branch
Manager: Caleb LeGrand                      Effective Date: June 30, 2022

Celebrity Home Loans, LLC ("COMPANY") compensates on funded loan production measured within the production month.

| Compensation | | | | |
|---|---|---|---|---|
| **Source** | | | **Minimum Compensation Cap** | **Maximum Compensation Cap** |
| Self-Generated | $1,575 | Per File | - | - |

1. <u>Salary Rate of Pay:</u>  As an exempt Employee, Employee will be paid a base pay of $35,568.00 per year worked payable in semimonthly installments on or around the 1st and 16th of each month.

2. <u>Assigned Revenue Override.</u> Employee will receive a Monthly Override equivalent to one hundred percent (100%) of the Net Assigned Revenue. The Net Assigned Revenue is determined by subtracting all Branch Expenses from the Monthly Assigned Revenue. The Monthly Assigned Revenue is calculated by applying the Assigned Revenue Rate (the ARR) to the total monthly loan volume of the Branch. Employee's ARR shall be 340 BPS of first mortgage loans.  Loans are only counted toward monthly volume if the loan eventually closes, was originated while Employee was overseeing the Branch and the loan is a first mortgage.  No override will be earned on second mortgage transactions.  Branch Expenses are detailed in Article IV of the Employment Agreement. The Company reserves the right in its sole discretion to modify the ARR one time each calendar year, based upon long-term loan performance (i.e. payment defaults, early pay-offs, repurchase demands); investor, regulatory or consumer complaints about the branch; turn times of loans originated by the branch as compared to other branches; conformance to company policies, procedures, practices; and macro and microeconomic conditions affecting the company, industry and the Branch.  Changes will only apply to loans originated after the notice date of the change.

3. <u>Commission:</u> On or around the 1st and 16th of each month, Employee will be paid as an advance of commissions the basis points designated in the table above based upon Employee's loan production for any amounts in excess $1482.00. The commissions advanced on the 1st will be based upon loan production closed and funded the 1st through the 15th the prior month, and the commissions advanced on 16th will be based upon loan production closed and funded the 16th through the end of the prior month.  In the event Employee's commission calculation is equal or less than $1482.00, Employee is not eligible to receive any advanced commissions that pay period. However, no negative balance will accrue if Employee's commission calculation is less than that

DP Initials

BM Initials

# Producing Branch Manager Employment Agreement

amount, and under no circumstance, and at no time during or after employment, will Employee be required or expected to re-pay the Company based upon any shortfall. Employee compensation will not vary depending on whether a loan locks or closes at, above, or below the Base Price set by Company for Employee.

4. <u>All commission is advanced</u>: Employee is only considered to have earned and be entitled to payment of commission on loans once they have been sold on the secondary market and the period for any early payment default and early pay off period has expired. Notwithstanding this, the Company is advancing the commission on loans once they have been closed and funded under Employee's supervision as detailed in paragraph 2. In the event such commission is advanced, but is later deemed un-earnable as a result of failure to sell, a repurchase demand, an early payment default or early payoff period, the amounts advanced will be subtracted from any unearned commission(s) not yet paid to Employee. No payment will be advanced, nor commission paid on loans that Employee did not originate, or that were not closed while under Employee's authorized supervision. The limited exception to this is detailed in Article III of the Employment Agreement. It is understood that Employee is not entitled to commission pursuant to this Addendum simply for procuring a loan.

5. <u>Prospective Compensation Adjustments</u>: Employee's compensation may not be adjusted more than once in any three (3)-month period. The Company may review and, in its sole discretion, amend Employee's compensation (and alter the terms of this Addendum A) after the Employee's initial ninety (90) days of employment with Company, and then as often as once in a three (3) month period. However, the Company contemplates that as a matter of course compensation will not be adjusted that regularly absent reason. For example, Employee's compensation will be subject to review for an adjustment if (i) s/he requests a compensation review; (ii) there are losses associated with epds, epos, repurchases, or unsalable loans; (iii) Employee has not met minimum production volumes; (iv) Employee is found to have breached his/her employment agreement or violated a written Company policy; or (v) the branch Employee is associated with cannot support Employee's existing compensation structure. In the event an Employee's compensation is evaluated for adjustment, a variety of criteria including pull through rate, quality of loan files, loan volume, seniority, overall sources of origination, loan performance, any relevant competitive forces impacting Employee's customer base, and any relevant macroeconomic trends will be reviewed. Notwithstanding the foregoing, the Company can adjust the compensation levels at any time in the event it determines that that it is required to do so to enable the production center to operate profitably, to comply with state and or federal requirements, or economic conditions require overall changes to compensation or pricing. In addition, Employee's commission rate can be adjusted or suspended at any time if the Company has reason to believe that (i) Employee has breached his fiduciary duty or obligation to the Company; (ii) Employee has violated any law, policy, procedure or acted improperly in regard to the Company or in any transaction with a consumer; or (iii) Employee is engaged in self-dealing, acting purely in his/her own pecuniary



DP Initials       BM Initials

DocuSign Envelope ID: B74FB594-25E9-4317-9346-B1EA3927E905

# Producing Branch Manager Employment Agreement

interest without regard to and inconsistent with the interests of the Company and/or the consumer.  Adjustments will only be effective after the notice date of the change.

6. <u>Closed Loan</u>: As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, all rescission periods have expired, and all proper documentation has been filed and prepared in accordance with TILA/RESPA.

7. <u>Piggyback Second Mortgages</u>: Compensation is not paid on piggyback second mortgages whether the loan is funded by the Company or brokered by the Company. A piggyback second mortgage is a mortgage in a subordinated lien position which is consummated at the same time as the first mortgage. Due to the higher risk associated with 2nd lien loans, piggyback second mortgages should only be originated as necessary to facilitate a better overall loan structure for the borrower. It's the Company's policy to originate 1st lien loans whenever practical to do so.

8. <u>Disputes</u>: Employee agrees that within 30 days of the receipt of any payment of commissions, s/he will bring to the Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with commissions paid. Employee understands that if no such written dispute is initiated, Employee's silence constitutes an acknowledgement that commissions were properly calculated and paid.

9. <u>Severance</u>:  After separation of Employment for any reason and subject to all terms and conditions set forth in this Agreement, Employee shall be paid a severance subject to the following conditions: the Employee has not (during their employment or thereafter) engaged in a material breach of their employment agreement, CHL policies, or otherwise violated any fiduciary duty to CHL.  If any such commitments or obligations are breached during their employment or thereafter, the Employee forfeits the severance amount.  A forfeiture means both that the Employee is (1) not entitled to any severance amount(s) not paid to them AND (2) is required to repay to CHL any severance amounts already paid to them.   The severance amount is the sum of the balance contained in the Reserve Account as of Employee's termination date *plus*:

    a. the ARR applied to the volume of any additional loans that were originated and closed by the Branch during Employee's employment and that close within 30 days following separation date;

    b. commissions on any personal production pursuant to Paragraphs 3, 4, 6 and 7 of this Addendum on any loans which were originated by Employee while Employee was still an employee of the Company and which close within thirty (30) days of Employee's separation from the Company.

    *less*:

    a. any unpaid branch expenses attributable to Branch operations during the period of Employee's employment and the period covering 30 days after separation and;

    b. any EPO's or EPD's on loans originated by the Branch during Employee's employment or closed within thirty days of Employee's separation date.

DP Initials

BM Initials

# Producing Branch Manager Employment Agreement

The Company agrees that it will make best efforts to close any loans on time that remain in the Branch's pipeline following separation and that it will not cause any intentional delay of the closing of any loan, especially if such delay would cause it to close outside of the 30-day window for severance payment.   Employer will provide Employee a full accounting of the severance amount within 75 days of separation.  If any severance is due to Employee, it will be paid in accordance with the following schedule:

- 80% of the amount due within 90 days of separation;
- The remaining 20% will be payable within 30 days of the close of the Wind-Up Period (defined as 240 days following the separation date).


- A self-generated loan is defined as a loan or lead resulting from: loan officer cold calling potential customers; marketing efforts paid for by the loan officer; loan officer meeting a customer at non-Company sponsored events; referrals from real estate agents with which a loan officer has established a relationship; past client referrals of new business; and referrals from family and friends.


- Branch Referral is defined as a loan referred into the branch and distributed to a licensed loan originator



DP Initials                    BM Initials

# Producing Branch Manager Employment Agreement

**ADDENDUM B**

Branch Manager:   Caleb LeGrand                     Effective Date:   June 30, 2022

Employee shall provide the following property, owned by Employee and used for the mutual benefit of Celebrity Home Loans, LLC and Employee:

- All contents of the Branch Office other than the firewall supplied by the Employer are the property of the Employee and shall remain Employee's property should employment terminate for any reason
- It is agreed that the following items will remain the exclusive property of the Employee:
  - Domain clteam.us and all associated intellectual property with this domain – including email addresses
  - Dropbox account and all of its contents
  - Better Loan Process CRM and all of its contents and intellectual property

NMLS No.   259691                        Page 22 of 28

DP Initials

BM Initials

# **Mutual Agreement to Arbitrate Employment-Related Disputes**

This Mutual Agreement to Arbitrate Employment-Related Disputes (the "Agreement") is made and entered into by and between Celebrity Home Loans, LLC, an Illinois limited liability company, (the "Employer") and you (the "Employee") (the Employer and the Employee are collectively referred to as the "Parties").

1.  Intent of the Agreement. It is the intent of Parties to resolve all disputes, claims, and any other matters arising out of or relating to the Employee's employment by the Employer or termination of employment by binding private arbitration in accordance with the provisions of this Agreement. The Parties understand that by entering into this Agreement the Employee and the Employer are giving up the right to a jury trial or to file a lawsuit in court against the other, and the right to bring a representative, class or collective action against the other in court or in arbitration, regarding any claims covered by this Agreement.

2.  Mandatory Arbitration. In exchange for the mutual promises contained in this Agreement, Employer and Employee agree that:

(a)  Any and all "Covered Claims" (as defined in Section 3 below) shall be submitted to and resolved by final and binding arbitration before a sole neutral arbitrator (the "Arbitrator"), selected from Judicial Arbitration and Mediation Services, Inc. (or its successor) ("JAMS"), or if JAMS is not available or the Parties mutually agree, I jsuch Arbitrator shall be selected from American Arbitration Association (or its successor) ("AAA"). The arbitration shall be conducted in the city and state where the Employee works, or the city (in that state) with a JAMS or AAA office closest to the city where the Employee works, unless otherwise agreed by the Parties thereto.

(b)  The arbitration will be conducted in accordance with the JAMS Employment Rules & Procedures or the AAA Employment Arbitration Rules and Mediation Procedures (depending upon the organization administering the arbitration) in effect at the time the arbitration is commenced, except as otherwise modified by this Agreement. The JAMS Employment Rules & Procedures are available at www.jamsadr.com/rules-employment and the AAA's Employment Arbitration Rules and Mediation Procedures are available at www.adr.org/Rules. You may also contact our Human Resources Department at HR@celebrityhomeloans.com or (833) 667-8484 for a copy of these Rules. Please note, the Rules may be amended from time to time by JAMS and AAA. If the Rules are inconsistent with the terms of this Agreement, the terms of this Agreement shall govern.

(c)  The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, formation, or enforceability of this Agreement, including but not limited to the arbitrability of any dispute between the Parties, except for a dispute regarding the enforceability or scope of the waiver in Section 5, which shall be determined by a court of competent jurisdiction.

BM  Initials

## <u>Mutual Agreement to Arbitrate Employment-Related Disputes</u>

(d)     The Arbitrator's decision shall be final and binding only on the Parties to this Agreement and the Parties agree that awards deciding issues for similarly situated employees will have no preclusive effect in any arbitration between the Parties.

(e)     Nothing in this Agreement shall preclude the Parties from seeking provisional remedies, such as an injunction or temporary restraining order, in aid of arbitration from a court of competent jurisdiction or from the arbitrator.

(f)     The Arbitrator shall have no power to award punitive damages to either party, except where an applicable statute allows for punitive damages.

3.     <u>Covered Claims</u>. Except as provided in Section 4, Covered Claims under this Agreement shall include all past, current, and future grievances, disputes, claims, or causes of action that otherwise could be brought in a federal, state, or local court under applicable federal, state, or local laws, arising out of or relating to the Employee's employment with the Employer, including claims arising out of or related to the Employee's hiring, recruitment, and termination of employment, and including claims the Employee may have against the Employer or its officers, directors, supervisors, managers, employees, or agents in their capacity as such or otherwise, or that the Employer may have against the Employee. Covered Claims under this Agreement include claims arising out of or related to acts or omissions that occurred before entering into this Agreement and those that may occur in the future.

4.     <u>Claims Not Covered</u>. Notwithstanding anything to the contrary in Section 2 or Section 3 of this Agreement, nothing in this Agreement prevents or shall be interpreted to mean that the Employee is precluded from filing charges or complaints with the National Labor Relations Board (NLRB), the Equal Employment Opportunity Commission (EEOC), or any equivalent state or local agency, or testifying or participating in any proceedings before those administrative bodies, or requesting or receiving confidential legal advice.  If any such charge or complaint is dismissed from the administrative agency's jurisdiction, the parties must then submit to binding arbitration pursuant to this Agreement.  For example, Employee may do the following:

(a)     report any good faith allegation of unlawful employment practices to any appropriate federal, State, or local government agency enforcing discrimination laws;

(b)     report any good faith allegation of criminal conduct to any appropriate federal, State, or local official;

(c)     participate in a proceeding with any appropriate federal, State, or local government agency enforcing discrimination laws;

(d)     make any truthful statements or disclosures required by law, regulation, or legal process.

5.     <u>Waiver of Representative, Class and Collective Actions</u>. Employee and Employer expressly intend and agree that:

BM  Initials

DocuSign Envelope ID: B74EB691-25E9-4217-A346-B1EA3927E905

## __Mutual Agreement to Arbitrate Employment-Related Disputes__

(a)    representative, class and collective action procedures shall not be asserted and will not apply in any arbitration pursuant to this Agreement;

(b)    each party will not assert representative, class or collective claims against the other in court, in arbitration, or otherwise;

(c)    each party shall only submit their own individual claims in arbitration and will not seek to represent the interests of any other person;

(d)    any claims by the Employee will not be joined, consolidated, or heard together with the claims of any other employee;

(e)    no decision or arbitral award determining an issue with a similarly situated employee shall have any preclusive effect in any arbitration between the Parties, and the Arbitrator shall have no authority to give preclusive effect to the issues determined in any arbitration between the Employer and any other employee;

(f)    notwithstanding anything to the contrary in the JAMS' Employment Rules & Procedures or AAA's Employment Arbitration Rules and Mediation Procedures (depending upon the organization administering the arbitration), and the general grant of authority to the arbitrator in Section 2 to determine issues of arbitrability, the arbitrator shall have no jurisdiction or authority:

(i)    to compel any representative, class or collective claim, consolidate different arbitration proceedings, or join any other party to an arbitration between Employer and Employee; or

(ii)    to determine the enforceability or scope of the representative, class and collective action waiver, which shall be determined by a court of competent jurisdiction.

6.    Waiver of Trial by Jury. The Parties understand and fully agree that by entering into this Agreement to arbitrate, they are giving up their constitutional right to have a trial by jury, and are giving up their normal rights of appeal following the issuance of the arbitrator's award except as applicable law provides for judicial review of arbitration proceedings.

7.    Claims Procedure. Arbitration shall be initiated by the express written notice of either Party. The aggrieved Party must give written notice of any claim to the other Party. Written notice of Employee's claim shall be mailed by certified or registered mail, return receipt requested, to the Legal Department, Celebrity Home Loans, LLC, 1 Mid America Plaza, Suite 800, Oakbrook Terrace, IL 60181 with email to legal@celebrityhomeloans.com or to any agent designated for service of process in the applicable state. Written notice of Employer's claim will be mailed to the last known address and email of Employee or pursuant to any means for effective service of process in the applicable state. The written notice shall identify and describe the nature of all claims asserted and the facts supporting the claims. Written notice of arbitration

BM  Initials

## <u>Mutual Agreement to Arbitrate Employment-Related Disputes</u>

shall be initiated within the same time limitations that applicable federal and state law applies to those claim(s).

8. <u>Arbitrator Selection</u>. The Arbitrator shall be selected based upon the mutual agreement of the Parties. If the Parties are not able to agree upon the selection of an Arbitrator within twenty (20) days of the commencement of an arbitration proceeding (measured as the date of receipt of the written notice of any claim by the other Party pursuant to Section 7), then the Arbitrator shall be selected by the Parties' striking and ranking from a list of arbitrators supplied by JAMS or AAA in accordance with the process used by the organization administering the arbitration.

9. <u>Discovery</u>. The discovery procedures set forth by JAMS or AAA (depending upon the organization administering the arbitration) regarding discovery shall apply to arbitration under this Agreement. To the extent not provided for by these procedures, the Arbitrator has the power to order discovery upon a showing that discovery is necessary for a Party to have a fair opportunity to present a claim or defense. The arbitrator shall have the power to authorize all forms of discovery (including depositions, interrogatories and document production) upon the showing of (a) a specific need for the discovery, (b) that the discovery likely will lead to material evidence needed to resolve the controversy, and (c) that the scope, timing and cost of the discovery is not excessive. The Arbitrator shall have the authority to set deadlines for completion of discovery. The Arbitrator shall decide all discovery disputes.

10. <u>Governing Law; Substantive Law</u>. This Agreement and any arbitration shall be governed by the Federal Arbitration Act (FAA) to the exclusion of any state law inconsistent with the FAA. The Arbitrator shall apply the substantive state or federal law, including the applicable statute of limitations, as applicable to the claim(s) asserted in arbitration. Claims arising under federal law shall be determined in accordance with federal law. Common law claims shall be determined in accordance with the substantive law of the state where the Employee works, without regard to its conflict of law principles.

11. <u>Motions</u>. The Arbitrator shall have jurisdiction to hear and rule on prehearing disputes and is authorized to hold prehearing conferences by telephone or in person as the Arbitrator deems necessary. The Arbitrator shall have the authority to set deadlines for filing motions for summary adjudication, and to set briefing schedules for any motions. The Arbitrator shall allow the filing of a dispositive motion if the Arbitrator determines that the moving party has shown cause that the motion is likely to succeed and dispose of or narrow the issues in the case. The Arbitrator shall have the authority to adjudicate any cause of action, or the entire claim, pursuant to a motion for summary adjudication and in deciding the motion, shall apply the substantive law applicable to the cause of action.

12. <u>Compelling Arbitration; Enforcing Award</u>. Either party may ask a court to stay any court proceeding to compel arbitration under this Agreement, and to confirm, vacate, or enforce an arbitration award. Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction.



BM  Initials

## <u>Mutual Agreement to Arbitrate Employment-Related Disputes</u>

13.      <u>Arbitration Fees and Costs</u>. The Employer shall be responsible for the arbitrator's fees and arbitration expenses and any other costs unique to the arbitration hearing. Each Party shall pay its own deposition, witness, expert, and attorneys' fees and other expenses to the same extent as if the matter were being heard in court. However, if any Party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, or if there is a written agreement providing for attorneys' fees and costs to be awarded to the prevailing party, the Arbitrator may award reasonable attorneys' fees in accordance with the applicable statute or written agreement. The Arbitrator shall resolve any dispute as to the reasonableness of any fees or costs awarded under this paragraph.

14.      <u>Term of Agreement; Modification in Writing</u>. This Agreement to arbitrate shall survive the termination of Employee's employment. It can only be revoked or modified in a writing that specifically states an intent to revoke or modify this Agreement and is signed by both Employee and Employer.

15.      <u>Successors and Assigns</u>. Employer may freely assign this Agreement at any time. This Agreement shall inure to the benefit of Employer's successors and assigns.

16.      <u>Severability</u>. If any provision of this Agreement to arbitrate is adjudged to be void or otherwise unenforceable, in whole or in part, the void or unenforceable provision shall be severed and that adjudication shall not affect the validity of the remainder of this Agreement.  If any provision of this Agreement is held to be in conflict with a mandatory provision of applicable law, the conflicting provision of this Agreement shall be modified automatically to comply with the applicable law until such time as the provision can be formally modified to comply with the law.

17.      <u>Right to Opt Out</u>. The Employee shall have the right to opt out of this Agreement by providing written notice of the Employee's intention to do so to the Employer within thirty (30) days of receiving this Agreement (the "Opt Out Period") by both (1) certified or registered mail, return receipt requested, to the Human Resources Department, Celebrity Home Loans, LLC, 1 Mid America Plaza, Suite 800, Oakbrook Terrace, IL 60181 <u>and</u> (2) email to HR@celebrityhomeloans.com. Both methods are required to ensure Employer's receipt and ability to follow-up.  Employee is required to retain all copies of documentation evidencing notice as to the Employer within the Opt Out Period.  Continued employment after the Opt Out Period, without opting out of the Agreement according to its terms, constitutes acceptance of the terms of this Agreement.

18.      <u>Voluntary Agreement</u>. The Parties represent that they have been given the opportunity to fully review the terms of this Agreement. The Employee acknowledges and agrees that the Employee has had an opportunity to ask questions and consult with an attorney of the Employee's choice before agreeing to this Agreement. The Parties understand the terms of this Agreement and freely and voluntarily agree to them. **EACH PARTY FULLY UNDERSTANDS AND AGREES THAT THEY ARE GIVING UP CERTAIN RIGHTS OTHERWISE AFFORDED TO THEM BY CIVIL COURT ACTIONS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO A JURY OR COURT TRIAL AND THE RIGHT TO**

BM  Initials

## Mutual Agreement to Arbitrate Employment-Related Disputes

**BRING ANY CLAIM AS A REPRESENTATIVE, CLASS OR COLLECTIVE ACTION. THIS INCLUDES GIVING UP THE RIGHT TO PARTICIPATE IN ANY ACTION PURSUANT TO CALIFORNIA'S PRIVATE ATTORNEY GENERAL ACT (IF LOCATED IN THAT STATE).**

BY SIGNING BELOW, I AM AGREEING THAT I HAVE RECEIVED THIS MUTUAL AGREEMENT TO ARBITRATE EMPLOYMENT-RELATED DISPUTES AND I UNDERSTAND THAT IT IS MY RESPONSIBILITY TO READ AND COMPLY WITH THE TERMS CONTAINED HEREIN. I UNDERSTAND THAT EVEN IF I SIGN THIS AGREEMENT I HAVE THE OPPORTUNITY TO OPT OUT PURSUANT TO SECTION 17. I UNDERSTAND THAT EMPLOYER'S SENDING THIS AGREEMENT CONSTITUTES ITS AGREEMENT TO BE BOUND BY THE TERMS CONTAINED HEREIN. I ALSO UNDERSTAND THAT CONTINUED EMPLOYMENT WIHOUT OPT-OUT CONSTITUTES ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

DocuSigned by:

*Caleb LeGrand*

06C1E6FB8FD2403...

_____          _____
Signature

Caleb LeGrand

_____
Name

8/16/2022

_____
Date



BM  Initials